**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

OSSAMA NAGY; SHERIF SAAD;
NOOSHIN SOOZANGAR; SHAGUFLA
AZAD,
Plaintiffs-Appellants,

and

DAVID C. GRIGGS; ADEL ALALFEY,
Plaintiffs,

v.

No. 99-1859

THE BALTIMORE LIFE INSURANCE
COMPANY; LIFE OF MARYLAND,
INCORPORATED,
Defendants-Appellees,

v.

THE MARYLAND INSURANCE
COMMISSIONER,
Movant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CA-96-3673-AMD)

Argued: April 7, 2000

Decided: June 5, 2000

Before LUTTIG, Circuit Judge, Roger J. MINER,
Senior Circuit Judge of the United States Court of Appeals
for the Second Circuit, sitting by designation, and
Patrick M. DUFFY, United States District Judge for the
District of South Carolina, sitting by designation.

_____

Affirmed in part, vacated in part, and remanded in part by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Daniel F. Goldstein, BROWN, GOLDSTEIN & LEVY, Baltimore, Maryland, for Appellants. Stanley Mazaroff, VENABLE, BAETJER & HOWARD, L.L.P., Baltimore, Maryland, for Appellees. **ON BRIEF:** George Hermina, John Hermina, HERMINA LAW GROUP, Laurel, Maryland, for Appellants.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Before the court is an appeal from a summary judgment of the United States District Court for the District of Maryland (Davis, <u>J</u>.) holding, <u>inter alia</u>, that (1) plaintiffs had not established genuine issues of material fact concerning claims of race discrimination in light of the defendants' practice of targeting for insurance sales the very applicants allegedly discriminated against and (2) plaintiffs' alienage claim under 42 U.S.C. § 1981 failed because defendants' denial of life insurance was based on the nation of plaintiffs' origin, not merely their lack of U.S. citizenship. The appellants also appeal from certain discovery rulings by the district court.

Because the district court improperly resolved on summary judgment the alienage claims of two of the plaintiffs, despite their production of direct evidence supporting a finding of unlawful alienage discrimination, we remand. With respect to all other matters on appeal, we affirm.

2

## BACKGROUND

Plaintiffs-appellants are Sherif M. Saad ("Saad"), Ossama Nagy ("Nagy"), Nooshin Soozangar ("Soozangar"), and Shagufla Azad ("Azad"). Saad, Nagy, Soozangar, and Azad are non-U.S. citizens of Middle Eastern origin. The appellants allege that they were victims of the defendants-appellees' discriminatory insurance practices.

The defendants-appellees are Baltimore Life Insurance Company ("Baltimore Life"), and several of its officers and employees, including President L. John Pearson, Vice President of Underwriting William Vigliotte ("Vigliotte"), Vice President for Career Marketing Gary Ray, Executive Vice President David S. Sachs, Executive Vice President Damian A. Salvi, and Senior Underwriter Morrie R. Clark. Baltimore Life is the only mutual life insurance company domiciled in Maryland and is owned by its policyholders and managed for their benefit.

In 1994, Baltimore Life hired Adel Alalfey as a sales agent to cover a targeted market -- the Middle Eastern community in the Baltimore/Washington metropolitan area. As a result of the efforts of Baltimore Life and Alalfey, the company was successful in selling many life insurance policies to persons of Middle Eastern descent. More specifically, during the period from November 1994 to April 1996, Baltimore Life sold life insurance policies to over 40 persons whose places of birth or ancestry could be traced to a Middle Eastern or Arab country. However, Baltimore Life did not issue insurance policies to some of Alalfey's customers, whom it contends presented unacceptable mortality risks.

After Alalfey was hired, he met with Vigliotte to discuss plans to sell life insurance to people from the Middle East. When Alalfey told Vigliotte about his plan to sell insurance policies to certain employees of the Kuwaiti embassy, Vigliotte became concerned. Vigliotte stated that he "was reminded of the Gulf War and the ongoing risk of residing in Kuwait, and . . . had visions of blindfolded Americans in captivity in Iran."

After this conversation, Vigliotte cautioned his staff against providing life insurance policies to customers of Alalfey who were born in

3

and remained citizens of unstable countries and consequently were likely to become poor risks if they returned home. Although Baltimore Life's application does not ask applicants about their citizenship, it does ask for information about applicants'"Country of Birth." Between December 1994 and April 1995, as a result of Vigliotte's caution to the underwriting staff, the staff started checking whether applicants who answered that they were born abroad remained citizens of their "Country of Birth." To obtain this information, inquiries were made over the telephone by members of the underwriting staff.

Among the many applications screened, the underwriting staff found only three applicants who continued to be citizens of their country of birth and whom Vigliotte determined to be unacceptable underwriting risks. Those three individuals were Saad, Soozanger, and a third person who is not a party to this case.

On December 22, 1994, Alalfey submitted Saad's application for life insurance. The application revealed that Saad was born in Egypt and worked for the Kuwaiti government at its embassy in Washington, D.C. Pat Taylor ("Taylor"), a staff member in the underwriting department, telephoned Saad and learned that he was a citizen of Egypt. On December 30, 1994, Saad was notified by letter that his application for life insurance was rejected. The letter read, in pertinent part:

> We have completed our review of the life insurance policy for which you recently applied. Unfortunately, we are unable to offer you coverage. . . . This case is being declined since it is company policy not to issue coverage on non-United States citizens.

(emphasis added).

Soozangar applied for life insurance on December 29, 1994. Her application showed that she was born in Iran. Accordingly, Taylor telephoned Soozangar to determine whether she was still an Iranian citizen. Upon learning that Soozangar remained a citizen of Iran, Baltimore Life rejected her application. On January 11, 1995, she received a letter identical to that sent to Saad. According to Vigliotte, Baltimore Life stopped inquiring about the citizenship of applicants

4

on April 3, 1995. In April 1996, after Vigliotte had informed Alalfey that Baltimore Life was no longer evaluating applicants' citizenship, Alalfey resubmitted Soozangar's application for life insurance. The application was thereafter approved.

On November 25, 1996, the appellants, and a fifth plaintiff named David C. Griggs ("Griggs"), who was a former District Manager for Baltimore Life, filed a class action lawsuit in the United States District Court for District of Maryland, asserting violations of 42 U.S.C. § 1981, 42 U.S.C. § 1982, and the Maryland common law, arising from the alleged refusal of Baltimore Life to issue policies to non-U.S. citizens. The complaint also alleged breach of contract, fraud, and wrongful discharge on behalf of Griggs and Alalfey. The complaint made a demand for a jury trial and sought an aggregate amount of approximately $150,000,000.00 in damages.

In December of 1998 and January of 1999, a discovery dispute arose that related to plaintiffs' service of a motion to compel on Baltimore Life. After the motion was served, but before it was filed, Baltimore Life apparently filed a motion to strike. The plaintiffs then attempted to file their motion to compel with the court. On January 13, 1999, the district court issued an order denying all pending motions dealing with discovery and setting certain discovery deadlines. On the same date, the court sent a letter to counsel stating in relevant part:

> I have concluded that the most sensible way out of the pit into which this case has fallen is to start fresh. Accordingly, by separate order, I am DENYING all of your pending motions and cross motions for protective order, etc. All prior rulings are wiped from the slate, an amended scheduling order is being issued, and you are all being given the opportunity to avoid the imposition of very substantial sanctions.
>
> Hereafter, you will cooperate fully in scheduling the completion of discovery and you will not file another motion to compel or for protective order or any similar motion.

5

> Despite the informal nature of this ruling, it shall consti-
> tute an Order of Court, and the Clerk is directed to docket
> it accordingly.

Thereafter, the court returned the motion to compel that the plaintiffs had attempted to file. The plaintiffs then protested the return by filing a motion for reconsideration. Apparently, the district court never ruled on this motion for reconsideration.

On May 24, 1999, the district court issued a Memorandum Opinion and accompanying Order. The opinion dealt with several pending motions, two of which are relevant on appeal: (1) the defendants' motion to exclude the testimony of Alalfey and (2) the defendants' motion for summary judgment.

With regard to the defendants' motion to exclude the testimony of Alalfey, the court initially noted that plaintiffs' counsel was represent-ing Alalfey in state court litigation arising out of his former employ-ment with Baltimore Life. The court then found that Alalfey's deposition had been postponed several times and attributed this to "[t]he inexcusable game-playing and bad faith manifested by Alalfey and plaintiffs' counsel." The court concluded that the "[e]xclusion of [Alalfey's] testimony [wa]s a measured and appropriate response under the circumstances" and granted the defendants' motion.

The majority of the court's opinion addressed the substantive motion for summary judgment. Because the case giving rise to this appeal involved claims predicated on direct evidence of discrimina-tion, the court required plaintiffs to "produce direct evidence of a stated purpose to discriminate on the basis of [ethnicity or citizenship] and/or circumstantial evidence of a stated purpose to discriminate on the basis of [ethnicity or citizenship] of sufficient probative force to reflect a genuine issue of material fact." (internal quotation omitted).

Turning to the allegations of race discrimination, the court flatly rejected this claim, finding the record replete with evidence that many persons other than plaintiffs, yet of the same Middle Eastern ancestry, applied for and received life insurance policies from Baltimore Life during the time in question. The court also relied on Baltimore Life's obvious intent to increase the sale of life insurance policies to mem-

6

bers of the Middle Eastern community in the Baltimore/Washington metropolitan area.

Thus, all that remained were the alienage discrimination claims. The district court found Duane v. GEICO, 37 F.3d 1036 (4th Cir. 1994), controlling and concluded that Section 1981 had been interpreted in our Circuit as outlawing discrimination against aliens. With regard to Nagy and Azad, the court flatly rejected their contention that they were ever denied life insurance by Baltimore Life.[1] However, the court found that with regard to Soozangar and Saad,"there [wa]s direct evidence of discrimination." Discussing the direct evidence of discrimination, the court noted that Vigliotte admitted that "he instituted a policy of rejecting applications from certain non-United States citizens" and also noted that a former Baltimore Life employee confirmed the existence of this policy. The court also referred to the explicit rejection letters that Saad and Soozanger received. Accordingly, the court concluded, "plaintiffs have available a quantum of evidence supportive of their claims." Nevertheless, the district court granted summary judgment as to the claims of Soozangar and Saad, reasoning as follows:

> On the whole, although there is admittedly some direct evidence that Baltimore Life rejected the plaintiffs in part because they were citizens of certain Middle Eastern countries, i.e., they were not citizens of the United States (or some other country), Baltimore Life nevertheless escapes liability as a matter of law because a rational juror would be compelled on this record to conclude that, rather than non-citizenship, plaintiffs' rejection was "solely" based "on the place or nation of [their] origin," see[Saint Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987)] . .., rejection on the basis of which does not support a cognizable claim under § 1981.

(emphasis added; emphasis from original omitted). The court also observed that the plaintiffs had not argued, and thus it did not seek

_____

[1] In a separate portion of the opinion, the court noted that it was undisputed that Baltimore Life had no record that Azad or Nagy ever applied to Baltimore Life for life insurance.

7

to determine, whether a mixed-motive analysis was appropriate in the context of Section 1981 alienage claims. Accordingly, the court granted the defendants' summary judgment motion in its entirety. This appeal followed.

## DISCUSSION

The appellants contend that there are genuine issues of material fact that preclude summary judgment in favor of defendants. The appellees argue that the district court was correct to grant summary judgment because the appellants cannot show that Baltimore Life denied them insurance on the basis of their alienage status. They contend that they actively marketed policies to persons of Middle Eastern descent and that they considered persons' place of birth and citizenship only as indicia of the likelihood of their traveling to dangerous foreign countries. The appellants also dispute the district court's rulings with regard to (1) the exclusion of Alalfey's testimony; (2) the appellants' attempted filing of a motion to compel discovery from Baltimore Life; and (3) the appellants' motion for reconsideration of the motion to compel.

## Standard of Review

We review a grant of summary judgment de novo . See Halperin v. Abacus Tech. Corp., 128 F.3d 191, 196 (4th Cir. 1997). Summary judgment is appropriate if "`there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In determining whether there is a genuine issue of material fact, the record is viewed in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). With regard to the discovery rulings and the decision to strike the testimony of Alalfey, we assess whether the district court abused its discretion. See United States v. Hassan El, 5 F.3d 726, 731 (4th Cir. 1993); United States v. Curry, 993 F.2d 43, 45 (4th Cir. 1993); Erdmann v. Preferred Research, Inc., 852 F.2d 788, 792 (4th Cir. 1988).

8

The Alienage Claim

42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166, § 101, 105 Stat. 1071, 1071-72, states as follows:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b) "Make and enforce contracts" defined
>
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c) Protection against impairment
>
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

In 1994, we interpreted the meaning of Section 1981 in the alienage context in Duane v. GEICO, 37 F.3d 1036 (4th Cir. 1994). Duane was a lawfully admitted, permanent resident alien of the United States and a citizen of Australia. As in our case, the plaintiff had sought insurance -- home insurance in that case -- and had been denied coverage. GEICO's sales agent had informed Duane that the company would not issue him a homeowner's policy because he was not a United States citizen. Thereafter, Duane confirmed that information

9

with a GEICO supervisor and filed suit. On appeal from a district court decision dismissing his claim, we found the 1991 amendments to Section 1981 inapplicable to the defendant's conduct, since the conduct occurred before passage of the Civil Rights Act of 1991. Accordingly, we looked only to what is currently codified as Section 1981(a). See id. at 1038. After detailing the history of Section 1981 and the Supreme Court caselaw surrounding its application, we noted that the Supreme Court had found Section 1981 applicable to government discrimination against aliens in Takahashi v. Fish & Game Comm'n, 334 U.S. 410 (1948). We then found that the relevant Supreme Court caselaw, legislative history, and construction of the Act indicated that Congress intended the Act to reach private discrimination against aliens. We concluded that Section 1981 prohibited private discrimination on the basis of alienage. See id. at 1042-43.

In the present case, the district court's own discussion of the evidence presented by Soozangar and Saad demonstrated that these two plaintiffs met their burden of producing direct evidence of discrimination on the basis of alienage. The rejection letters that both received from Baltimore Life stated that they were being denied insurance because "it is company policy not to issue coverage on non-United States citizens." These letters followed telephone calls inquiring into citizenship status. Additionally, Soozangar and Saad presented Vigliotte's own testimony that "he instituted a policy of rejecting applications from certain non-United States citizens." Nevertheless, the court discounted the importance of this evidence, drawing a distinction between discrimination based on the place or nation of origin, which it found permissible, and discrimination on the basis of non-citizenship. Finding that the discrimination here was really based on the plaintiffs' place or nation of origin, the court concluded that no rational juror could find for the plaintiffs.

However, the court inappropriately weighed the evidence and failed to recognize that once it found direct evidence of alienage discrimination, a "quantum of evidence" as the court put it, that there was presented a genuine issue of material fact that required resolution by a jury.[2] It is on this basis that we vacate and remand so much of

_____

[2] We recognize that the defendants contend that they only denied life insurance policies based on applicants' place of citizenship, not applicants' non-citizenship. Yet, these are arguments properly resolved by a trier of fact, not a district court or appellate court on summary judgment.

10

the district court's decision as rendered summary judgment for the defendants on the alienage claims made by Saad and Soozangar. As for the alienage claims advanced by Nagy and Azad, we agree with the district court that they failed to show that they were ever denied life insurance by Baltimore Life.

The Racial Discrimination Claims

Plaintiffs also dispute the district court's summary judgment against them on the race discrimination claims. We affirm the district court's ruling on this issue for substantially the same reasons given by that court. The plaintiffs failed to make the required showing either by direct or indirect evidence supporting a claim for discrimination on the basis of race so as to preclude summary judgment.

The District Court's Discovery and Motion in Limine Rulings

We also affirm the district court on these points, as the appellants' contentions lack merit. First, contrary to the appellants' assertions, the record supports the district court's decision to strike Alalfey's testimony on the basis of its finding of bad faith -- the sanction was reasonable in relation to the harm occasioned. Second, the district court's discovery rulings with regard to the motion to compel and consequent motion for reconsideration were reasonable. In any event, there is no evidence that the district court abused its discretion in these rulings. See Erdmann, 852 F.2d at 792.

CONCLUSION

We vacate so much of the district court's summary judgment as rejected the alienage claims of Saad and Soozangar and remand for further proceedings as to those claims in accordance with the foregoing. In all other respects, we affirm the rulings and judgment of the district court.

AFFIRMED IN PART, VACATED IN PART,
AND REMANDED

11